GEORGE S. CARDONA
Acting United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
DAVID K. WILLINGHAM (State Bar No. 198874)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0438
    Facsimile:  (213) 894-6269
    E-mail: david.willingham@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 07 **07-00060** |
| | ) | |
| Plaintiff, | ) | <u>PLEA AGREEMENT FOR DEFENDANT</u> |
| | ) | <u>JUSTIN PAPERNY</u> |
| v. | ) | |
| | ) | |
| JUSTIN PAPERNY, | ) | |
| | ) | |
| Defendant. | ) | |
|_____| ) | |

    1.   This constitutes the plea agreement between Justin
Paperny ("defendant") and the United States Attorney's Office for
the Central District of California ("the USAO") in the above-
captioned case.  This agreement is limited to the USAO and cannot
bind any other federal, state or local prosecuting,
administrative or regulatory authorities.

<u>PLEA</u>

    2.   Defendant understands and gives up the right to
indictment by a grand jury in this matter and agrees to plead
guilty to a one-count information in the form attached to this
agreement or a substantially similar form.

## NATURE OF THE OFFENSE

3.    In order for defendant to be guilty of count one of the Information, which charges a violation of Title 18, United States Code, Section 371, the following must be true:  first, there was an agreement between two or more persons to commit mail fraud, in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18 U.S.C. § 1343; and securities fraud, in violation of 18 U.S.C. § 1348; second, defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and third, one of the members of the conspiracy performed at least one overt act in furtherance of the illegal object. Defendant admits that defendant is, in fact, guilty of this offense as described in count one of the Information.

## PENALTIES AND RESTITUTION

4.    The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371 is: 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

5.    Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release, which could

result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

6. Defendant understands that defendant may be required to pay full restitution to the victims of the offense.

7. Defendant also understands that, by pleading guilty, defendant may be giving up valuable United States government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury.

8. Defendant further understands that the conviction in this case may subject defendant to various collateral consequences, including but not limited to, deportation from the United States, revocation of probation, parole, or supervised release in another case, and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's plea of guilty.

FACTUAL BASIS

9. Defendant and the USAO agree and stipulate to the statement of facts attached hereto as Exhibit "A" and incorporated herein by reference. This statement of facts includes facts sufficient to support a plea of guilty to the charge described in this agreement and to establish the agreed upon sentencing guideline factors set forth in paragraph 12 below. It is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to

defendant that relate to that conduct.

## WAIVER OF CONSTITUTIONAL RIGHTS

10. By pleading guilty, defendant gives up the following rights:

a) The right to persist in a plea of not guilty.

b) The right to a speedy and public trial by jury.

c) The right to the assistance of legal counsel at trial, including the right to have the Court appoint counsel for defendant for the purpose of representation at trial. (In this regard, defendant understands that, despite his plea of guilty, he retains the right to be represented by counsel - and, if necessary, to have the court appoint counsel if defendant cannot afford counsel - at every other stage of the proceedings.)

d) The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e) The right to confront and cross-examine witnesses against defendant.

f) The right, if defendant wished, to testify on defendant's own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

g) The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

By pleading guilty, defendant also gives up any and all

4

rights to pursue any affirmative defenses, Fourth Amendment or
Fifth Amendment claims, and other pretrial motions that have been
filed or could be filed.

SENTENCING FACTORS

11.   Defendant understands that the Court is required to
consider the United States Sentencing Guidelines ("U.S.S.G." or
"Sentencing Guidelines") among other factors in determining
defendant's sentence.  Defendant understands, however, that, the
Sentencing Guidelines are only advisory and that after
considering the Sentencing Guidelines, the Court is free to
exercise its discretion to impose any reasonable sentence up to
the maximum set by statute for the crime of conviction.

12.   Defendant and the USAO agree and stipulate that the
November 1, 2004 version of the Sentencing Guidelines apply and
to the following applicable sentencing guideline factors:

| | | |
|---|---|---|
| Base Offense: | 6 | (U.S.S.G. § 2B1.1) |
| Loss ($2.5+ million) | +18 | (U.S.S.G. § 2B1.1(b)(1)(N)) |
| More Than 10 Victims: | +2 | (U.S.S.G. § 2B1.1(b)(2)(A)) |
| Sophisticated Means: | +2 | (U.S.S.G. § 2B1.1(b)(8)(C)) |
| Registered Broker or: Investment Advisor | +4 | (U.S.S.G. §§ 2B1.1(b)(12)(B)(ii), (iii)) |
| Acceptance: | -3 | (U.S.S.G. § 3E1.1) |
| TOTAL OFFENSE LEVEL: | 29[1] | |

---

[1]   Pursuant to U.S.S.G. § 5G1.1, where the statutorily
authorized maximum sentence is less than the minimum of the
applicable Sentencing Guideline range, the statutorily authorized
maximum sentence shall be the Guideline sentence.  Thus, the
total offense level in this case shall be level 25.

Defendant and the USAO agree not to seek, argue, or suggest in
any way, either orally or in writing, that any other specific
offense characteristics or adjustments apply, but reserve the
right to argue that departures may be appropriate except, as
follows and as set forth in paragraphs 17(b) and 17(e) below.
First, the applicability of the adjustment for acceptance of
responsibility is subject to the conditions set forth in
paragraph 17(b) below.  Second, the government maintains the
discretion and the right to seek a downward departure pursuant to
U.S.S.G. § 5K1.1, as set forth in paragraph 17(e) below.  Third,
if after signing this agreement but prior to sentencing,
defendant were to commit an act, or the USAO were to discover a
previously undiscovered act committed by defendant prior to
signing this agreement, which act, in the judgment of the USAO,
constituted obstruction of justice within the meaning of U.S.S.G.
§ 3C1.1, the USAO would be free to seek the enhancement set forth
in that section.

13.   There is no agreement as to defendant's criminal
history or criminal history category.

14.   The stipulations in this agreement do not bind either
the United States Probation Office or the Court.  Both defendant
and the USAO are free to: (a) supplement the facts stipulated to
in this agreement by supplying relevant information to the United
States Probation Office and the Court, (b) correct any and all
factual misstatements relating to the calculation of the
sentence, and (c) argue on appeal and collateral review that the

Court's Sentencing Guidelines calculations are not error, although each party agrees to maintain its view that the calculations in paragraph 12 are consistent with the facts of this case.

### DEFENDANT'S OBLIGATIONS

15. Defendant agrees that he will:

a) Plead guilty as set forth in this agreement.

b) Not knowingly and willfully fail to abide by all sentencing stipulations contained in this agreement.

c) Not knowingly and willfully fail to: (i) appear as ordered for all court appearances, (ii) surrender as ordered for service of sentence, (iii) obey all conditions of any bond, and (iv) obey any other ongoing court order in this matter.

d) Not to commit any crime; however, offenses which would be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are not within the scope of this agreement.

e) Not knowingly and willfully fail to be truthful at all times with Pretrial Services, the U.S. Probation Office, and the Court.

f) Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay.

16. Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation, the Internal Revenue Service, the Securities and Exchange Commission, and, as directed by the USAO, with any other federal, state, or local or foreign law enforcement or regulatory agency. This cooperation requires

7

defendant to:

a)  Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

b)  Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

c)  Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

## THE USAO'S OBLIGATIONS

17.  If defendant complies fully with all defendant's obligations under this agreement, the USAO agrees:

a)  To abide by all sentencing stipulations contained in this agreement.

b)  At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, to recommend a two-level reduction in the applicable sentencing guideline offense level, pursuant to U.S.S.G. § 3E1.1, and to recommend, and if necessary, move for an additional one-level reduction if available under that section.

c)  Not to offer as evidence in its case-in-chief in the above-captioned case or any other prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any case that may be brought against

8

defendant by the USAO, any statements made by defendant or documents, records or tangible evidence provided by defendant pursuant to this agreement or the letter agreement entered into by the parties dated February 1, 2005 (the "Letter Agreement"). Defendant agrees, however, that the USAO may use such statements, documents, records and tangible evidence: (1) for the purpose set forth in paragraph 17(e), (2) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any prosecution of defendant, (3) to cross-examine defendant should defendant testify, or to rebut any evidence, argument or representations made by defendant or a witness called by defendant in any trial, sentencing hearing, or other court proceeding, and (4) in any prosecution of defendant for false statement, obstruction of justice, or perjury.

d)   In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

e)   If the USAO determines, in its exclusive judgment, that defendant has both complied with his obligations under paragraphs 15 and 16 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to impose a sentence below the Guideline sentence otherwise provided for under the Sentencing Guidelines.

f)   Not to further prosecute defendant for violations arising out of defendant's conduct described in the stipulated

factual basis set forth in Exhibit "A".  Defendant understands that the USAO is free to prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the appropriate Sentencing Guidelines range, where the sentence should fall within that range, and the propriety and extent of any departure from that range.

DEFENDANT'S UNDERSTANDINGS REGARDING SUBSTANTIAL ASSISTANCE

18.  Defendant understands the following:

a)  Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b)  Nothing in this agreement requires the USAO or any other prosecuting or law enforcement agency to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c)  Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced sentence or if the USAO makes such a motion and the Court does not grant it.

d)  At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes substantial assistance.  The decision whether defendant has provided

1   substantial assistance rests solely within the discretion of the

2   USAO.

3          e)    The USAO's determination of whether defendant has

4   provided substantial assistance will not depend in any way on

5   whether the government prevails at any trial or court hearing in

6   which defendant testifies.

7                          <u>BREACH OF AGREEMENT</u>

8      19.   If defendant, at any time between the execution of this

9   agreement and the completion of defendant's cooperation pursuant

10  to the agreement or defendant's sentencing on a non-custodial

11  sentence or surrender for service on a custodial sentence,

12  whichever is later, knowingly violates or fails to perform any of

13  defendant's obligations under this agreement ("a breach"), the

14  USAO may declare this agreement breached.  For example, if the

15  defendant knowingly in an interview, before a grand jury, or at

16  trial, falsely accuses another person of criminal conduct or

17  falsely minimizes his own role, or the role of another, in

18  criminal conduct, he will have breached this agreement.  If the

19  USAO declares this agreement breached, and the Court finds such a

20  breach to have occurred, defendant will not be able to withdraw

21  defendant's guilty plea, and the USAO will be relieved of all of

22  its obligations under this agreement.  In particular:

23         a)    The USAO will no longer be bound by any agreements

24  concerning sentencing and will be free to seek any sentence up to

25  the statutory maximum for the crime to which defendant has

26  pleaded guilty.

27

28                                 11

b)   The USAO will no longer be bound by any agreements regarding criminal prosecution, and will be free to prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated to dismiss or not to prosecute pursuant to this agreement.

c)   The USAO will be free to prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d)   The USAO will no longer be bound by any agreement regarding the use of statements, documents, records, tangible evidence, or information provided by defendant, and will be free to use any of those in any way in any investigation, prosecution, or civil or administrative action.   Defendant will not be able to assert either (1) that those statements, documents, records, tangible evidence, or information were obtained in violation of the Fifth Amendment privilege against compelled self-incrimination, or (2) any claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements, documents, records, tangible evidence, or information provided by defendant before or after the signing of this agreement, or any leads derived therefrom, should be inadmissible.

20.   Following a knowing and willful breach of this agreement by defendant, should the USAO elect to pursue any charge or any civil or administrative action that was either

12

dismissed or not filed as a result of this agreement, then:

a)   Defendant agrees that the applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the commencement of any such prosecution or action.

b)   Defendant gives up all defenses based on the statute of limitations, any claim of preindictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of defendant's signing of this agreement.

c)   Defendant agrees that: i) any statements made by defendant, under oath, at the guilty plea hearing; ii) the stipulated factual basis statement in this agreement; and iii) any evidence derived from such statements, are admissible against defendant in any future prosecution of defendant, and defendant shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from any statements should be suppressed or are inadmissible.

<u>WAIVER OF APPEAL AND COLLATERAL ATTACK</u>

21.   Defendant gives up the right to appeal any sentence imposed by the Court, including any order of restitution, and the manner in which the sentence is determined, provided that the sentence is within the statutory maximum specified above and is

13

constitutional.   Defendant also gives up any right to bring a
post-conviction collateral attack on the conviction or sentence,
including any order of restitution, except a post-conviction
collateral attack based on a claim of ineffective assistance of
counsel, a claim of newly discovered evidence, or an explicitly
retroactive change in the applicable Sentencing Guidelines,
sentencing statutes, or statutes of conviction.   Notwithstanding
the foregoing, defendant retains the ability to appeal the
Court's determination of the conditions of probation or
supervised release imposed by the Court, with the exception of
the following:   standard conditions set forth in district court
General Orders 318 and 01-05; the drug testing conditions
mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol
and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

RESULT OF VACATUR, REVERSAL OR SET-ASIDE

22.   Defendant agrees that if the count of conviction is
vacated, reversed, or set aside, the USAO may ask the Court to
void the entire plea agreement, with both the USAO and defendant
being released from all of their obligations under this
agreement.

COURT NOT A PARTY

23.   The Court is not a party to this agreement and need not
accept any of the USAO's sentencing recommendations or the
parties' stipulations.   Even if the Court ignores any sentencing
recommendation, finds facts or reaches conclusions different from
any stipulation, and/or imposes any sentence up to the maximum

14

1   established by statute, defendant cannot, for that reason,

2   withdraw defendant's guilty plea, and defendant will remain bound

3   to fulfill all defendant's obligations under this agreement.   No

4   one -- not the prosecutor, defendant's attorney, or the Court --

5   can make a binding prediction or promise regarding the sentence

6   defendant will receive, except that it will be within the

7   statutory maximum.

8                       <u>NO ADDITIONAL AGREEMENTS</u>

9        24.   Except as set forth herein, there are no promises,

10  understandings or agreements between the USAO and defendant or

11  defendant's counsel.   This agreement supersedes and replaces the

12  Letter Agreement.   Nor may any additional agreement,

13  understanding or condition be entered into unless in a writing

14  signed by all parties or on the record in court.

15          <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

16       25.   The parties agree and stipulate that this agreement

17  will be considered part of the record of defendant's guilty plea

18  //

19  //

20  //

1    hearing as if the entire agreement had been read into the record

2    of the proceeding.

3        This agreement is effective upon signature by defendant and

4    an Assistant United States Attorney.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF CALIFORNIA

7
     GEORGE S. CARDONA

8    Acting United States Attorney

9

10   _____

11   DAVID K. WILLINGHAM
     Assistant United States Attorney
     Deputy Chief, Major Frauds Section

12

13       I have read this agreement and carefully discussed every

14   part of it with my attorneys.  I understand the terms of this

15   agreement, and I voluntarily agree to those terms.  My attorneys

16   have advised me of my rights, of possible defenses, of the

17   Sentencing Guideline provisions, and of the consequences of

18   entering into this agreement.  No promises or inducements have

19   been made to me other than those contained in this agreement.  No

20   one has threatened or forced me in any way to enter into this

21   agreement.  Finally, I am satisfied with the representation of my

22   attorney in this matter.

23

24   _____          1/21/07
     JUSTIN PAPERNY                               _____
25   Defendant                                    Date

26

27

28                                16

1    We are Justin Paperny's attorneys.  We have carefully

2  discussed every part of this agreement with our client.  Further,

3  we have fully advised our client of his rights, of possible

4  defenses, of the Sentencing Guidelines' provisions, and of the

5  consequences of entering into this agreement.  To our knowledge,

6  our client's decision to enter into this agreement is an informed

7  and voluntary one.

8

9  _____        January 21, 2007
   ROBERT CORBIN                   Date
10 JOEL ATHEY
   Attorneys for Defendant
11 JUSTIN PAPERNY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              17

EXHIBIT A

United States v. Justin Paperny

STATEMENT OF FACTS


a.   Capital Management Group Holding Company LLC ("CMG") was an investment company operating in Southern California, within the Central District of California.  CMG solicited investments in what it claimed was a hedge fund, namely the GLT Venture Fund, L.P. ("GLT").  CMG claimed that GLT had been in operation since 1997 and received annual rates of return of approximately 27 percent.  In fact, CMG and GLT had not been in operation since 1997, and CMG and GLT had not seen annual rates of return of approximately 27 percent.  In July 2000, CMG became a registered investment advisor through the California Department of Corporations ("CDC").  That registration was held until approximately August 2003, when it was revoked by the CDC.

b.   Between at least September 2000 and January 2005, based upon false representations, more than 40 investors in the Central District of California and elsewhere throughout the United States invested more than $7 million with CMG.

c.   Co-Conspirator KEITH GILABERT ("GILABERT") was the founder of CMG and GLT.  Co-Conspirator GILABERT exercised control over CMG and GLT investor accounts and the representations made to the investors.  During the course of the conspiracy, Co-Conspirator GILABERT personally diverted, and caused others to divert, investments in CMG and GLT for various

unauthorized purposes, including the purchase of personal and
real property.

       d.   From approximately December 1998 to March 2000,
defendant JUSTIN PAPERNY ("PAPERNY") was a co-worker of Co-
Conspirator GILABERT in the Los Angeles office of a major
brokerage firm ("BROKERAGE FIRM #1").  In or about March 2000,
Co-Conspirator GILABERT left BROKERAGE FIRM #1 to found CMG.  By
June 2001, defendant PAPERNY worked in the Los Angeles office of
a different brokerage firm ("BROKERAGE FIRM #2").  In or about
July 2002, co-conspirator GILABERT transferred the assets of CMG
to BROKERAGE FIRM #2 into an account set up for GLT.  Defendant
PAPERNY served as one of two account managers for the GLT account
at BROKERAGE FIRM #2, and was also an account vice-president at
BROKERAGE FIRM #2.  The other GLT account manager ("Co-Account
Manager") was a Senior Vice President at BROKERAGE FIRM #2 who
worked with defendant PAPERNY on the GLT account.  Co-Conspirator
GILABERT made trades through a number of brokerage firms,
including through BROKERAGE FIRM #2.  In addition, BROKERAGE FIRM
#2 acted as the custodian of assets for GLT's funds and as the
trading clearing house for all GLT trades, whether made through
BROKERAGE FIRM #2 or any other brokerage firm.  At all relevant
times, defendant PAPERNY has been a registered broker, holding a
license to sell securities as an associate of major brokerage
firms.

       e.   From at least September 2000 through January 2005, CMG
was a company operated by Co-Conspirator GILABERT that purported

1    to offer investments in GLT.   Between September of 2000 and

2    January 2005, Co-Conspirator GILABERT received more than $7

3    million from more than 40 investor clients in CMG.   Since at

4    least 2002, Co-Conspirator GILABERT and CMG represented to

5    investors that it had been in business since 1997, and had seen

6    annual returns averaging approximately 27 percent.   In fact, Co-

7    Conspirator GILABERT had not operated CMG in 1997 and CMG had not

8    been in business since 1997.   Moreover, since its inception, CMG

9    and GLT had not earned a 27 percent rate of return for investors

10   and had in fact lost and misappropriated investor's funds

11   throughout most of its operation.

12        f.   Co-Conspirator GILABERT directed the trades of stock on

13   behalf of CMG's clients.   In order to effect these stock trades,

14   Co-Conspirator GILABERT utilized the services of several

15   brokerage firms, including BROKERAGE FIRM #2, which was a

16   nationwide brokerage firm that, beginning in July 2002, served as

17   both the custodian of assets and trade clearing house for GLT.

18        g.   Between at least April 2002 and January 2005, Co-

19   Conspirator GILABERT conspired with defendant PAPERNY to mislead

20   current and prospective investors of CMG with regard to, among

21   other things: (1) the investment strategy (and hence risk) that

22   would be used by GLT in making trades; (2) the oversight of GLT

23   by BROKERAGE FIRM #2; and (3) BROKERAGE FIRM #2's endorsement of

24   Co-Conspirator GILABERT's qualifications and ability to

25   effectively manage trading activity of GLT.

26

27

28                                    20

h.   Despite knowing of Co-Conspirator GILABERT's misrepresentations to current and potential investors regarding GLT, defendant PAPERNY met with Co-Conspirator GILABERT and some current and potential investors, and knowingly made false statements to those investors with regard to, among other things: (1) the investment strategy (and hence risk) that would be used by GLT in making trades; (2) the oversight of GLT by BROKERAGE FIRM #2; (3) BROKERAGE FIRM #2's endorsement of Co-Conspirator GILABERT's qualifications and ability to effectively manage trading activity of GLT; and (4) the actual value of a current investor's assets and investment strategy.  Co-Account Manager was aware of and endorsed a number of defendant PAPERNY's and Co-Conspirator GILABERT's fraudulent activities.

i.   For example, in early 2002, Co-Conspirator GILABERT was attempting to get prospective investor S.B. to invest a substantial sum of money with CMG.  As part of that process, Co-Conspirator GILABERT asked defendant PAPERNY to send him an electronic communication that would give the misimpression that BROKERAGE FIRM #2 would make shares of a highly-anticipated initial public offering ("IPO") available to Co-Conspirator GILABERT.  Defendant PAPERNY did so knowing that Co-Conspirator GILABERT would use the electronic communication to mislead S.B. into believing that if S.B. invested in CMG, he too would receive some of those IPO shares.  Pursuant to their agreement, defendant PAPERNY sent an electronic communication (via interstate wire) to Co-Conspirator GILABERT reflecting Co-Conspirator GILABERT's

access to the IPO shares for CMG's clients, when in fact
defendant PAPERNY knew at the time he sent the electronic
communication that BROKERAGE FIRM #2 would not be able to provide
Co-Conspirator GILABERT with shares of the IPO.  This electronic
communication from defendant PAPERNY was given to S.B. by Co-
Conspirator GILABERT and was an important factor in S.B.'s
ultimate decision to invest with CMG.  Subsequently, the funds
S.B. invested in CMG were transferred to BROKERAGE FIRM #2's
account for GLT, along with all other CMG funds.  Co-Account
Manager was aware of defendant PAPERNY's electronic communication
to Co-Conspirator GILABERT and that the purpose of the
communication was to mislead S.B. in an effort to have him invest
in CMG and GLT.

    j.  In or about late 2003, defendant PAPERNY attended a
meeting with, among others, Co-Conspirator GILABERT and S.B.  At
the meeting, Co-Conspirator GILABERT made statements to S.B. that
defendant PAPERNY knew to be false, including: (1) the current
value of S.B.'s investment in GLT; and (2) the investment
strategy that would be used going forward regarding S.B.'s assets
in GLT.  Defendant PAPERNY knew these statements to be false but
said nothing to correct them, despite knowing that S.B. had
requested defendant PAPERNY to attend the meeting as a
representative of BROKERAGE FIRM #2, in order to provide further
comfort to S.B. regarding his investment in GLT.  In addition,
defendant PAPERNY made affirmative misrepresentations to S.B. at
the same meeting, including: (1) confirming the value of S.B.'s

1  investment in GLT to be substantially higher than defendant
2  PAPERNY knew it to be at that time; and (2) stating that S.B.'s
3  assets (which were not as high as discussed at the meeting) would
4  be invested more conservatively in the future so that the
5  falsely-inflated value that S.B. was led to believe existed,
6  would be at less risk.  Immediately after the meeting, defendant
7  PAPERNY purchased Treasury bonds, in accordance with instructions
8  given at the meeting that S.B. wanted a more conservative
9  investment.  Shortly after the Treasury bonds were purchased, Co-
10 Conspirator GILABERT instructed Co-Account Manager to sell the
11 bonds, thereby making additional cash funds available to further
12 Co-Conspirator GILABERT's fraudulent schemes.  Co-Account Manager
13 was aware that Co-Conspirator GILABERT had lost most of the money
14 in GLT and that Co-Conspirator GILABERT was concealing these
15 losses from S.B. by misrepresenting that S.B.'s investments were
16 secure and had not sustained significant losses.  Co-Conspirator
17 GILABERT told Co-Account Manager that the only reason for buying
18 the Treasury bonds in the first place was to be able to show S.B.
19 the purchase confirmation.

20     k.   In or about October 2004, defendant PAPERNY was
21 contacted by S.D., who indicated he had several clients who
22 wanted to invest money in GLT.  Defendant PAPERNY sent paperwork
23 to S.D. in order for the clients to open new accounts with
24 BROKERAGE FIRM #2 (which was a necessary predicate for their
25 money to be transferred to GLT).  Along with this paperwork,
26 defendant PAPERNY sent an electronic communication to S.D.

27

28                                23

(copied to Co-Conspirator GILABERT and Co-Account Manager) giving the impression that BROKERAGE FIRM #2 had a detailed system in place to open and transfer all accounts to GLT.   In this electronic communication, defendant PAPERNY gave the impression that he had worked with Co-Conspirator GILABERT for some time and that BROKERAGE FIRM #2 and defendant PAPERNY had a well-tested system in place to work with hedge funds and that the transfer of S.D.'s client's accounts would be seamless and efficient. At the time he sent this electronic communication, defendant PAPERNY knew that GLT's true value was quite low and GLT was continuing to lose money.   Defendant PAPERNY understood that the electronic communication, sent by a representative from BROKERAGE FIRM #2, would create the misimpression that GLT was a reputable hedge fund.

1.    Defendant PAPERNY repeatedly informed various management and supervisory personnel at BROKERAGE FIRM #2, among other things,  that: (i) GLT was performing poorly, and (ii) GLT was not following its stated investment strategy.   More than one manager at BROKERAGE FIRM #2, despite being aware that GLT had suffered enormous losses, authorized and encouraged defendant PAPERNY to continue moving investor money to GLT's account at BROKERAGE FIRM #2 because the fees earned by BROKERAGE FIRM #2 due to GLT were extremely profitable given GLT's high margin and high-volume of trading, which generated commissions.

m.    In furtherance of their conspiracy, Co-Conspirator

24

GILABERT paid money to defendant PAPERNY through a third party. This money came from fees generated by Co-Conspirator GILABERT in the course of fraudulently managing GLT's trading activity. For example, on or about November 18, 2004, Co-Conspirator GILABERT caused the payment of CMG check number 1845, in the amount of $15,600.00, which compensated defendant PAPERNY for services he continued to arrange at BROKERAGE FIRM #2 while Co-Conspirator GILABERT fraudulently managed CMG and GLT.

n.   As described above, defendant PAPERNY and Co-Conspirator GILABERT engaged in a number of overt acts in furtherance of the conspiracy. Among other things, beginning in at least 2003, and continuing through at least December 2004, Co-Conspirator GILABERT mailed false account statements to clients of CMG via United States mail. Those account statements, compiled by Co-Conspirator GILABERT, falsely stated that the CMG accounts of the clients had increased in value. Defendant PAPERNY and Co-Account Manager believed that Co-Conspirator GILABERT was using the mails to defraud GLT investors by misrepresenting the value of their investments in GLT.

o.   When the GLT account at BROKERAGE FIRM #2 was frozen pursuant to a court order in January 2005, approximately $920,000 was left in the account, despite repeated prior assurances to investors that their money was safe and secure, and that their accounts had accumulated high rates of return. Thus, the investor losses as a result of the conspirators' conduct was well over $2.5 million.

1    I have read this statement of facts and carefully discussed
2  every part of it with my attorneys, Robert Corbin and Joel Athey.
3  I stipulate and agree that the statement of facts is accurate and
4  correct, and constitutes a factual basis for the entry of a plea
5  of guilty to violating 18 U.S.C. § 371, by conspiring to commit
6  mail fraud, wire fraud, and securities fraud.

7
8    _____          Date 1/21/07
9    JUSTIN PAPERNY
     Defendant

10    We are the attorneys representing Justin Paperny.  We have
11  carefully discussed every part of this statement of facts with
12  our client and agree that it constitutes a factual basis for our
13  client's guilty plea to one count of violating 18 U.S.C. § 371.

14
15    _____          Date January 21, 2007
16    ROBERT CORBIN
     JOEL ATHEY

17    Attorneys for Defendant
     JUSTIN PAPERNY
18
19
20
21
22
23
24
25
26
27
28                              26

## CERTIFICATE OF SERVICE

I, **Shaton McDaniel**, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

<u>PLEA AGREEMENT FOR DEFENDANT JUSTIN PAPERNY</u>

service  was:

| | | | |
|---|---|---|---|
| [ ] | Placed in a closed envelope, for collection and interoffice delivery addressed as follows: | [**✗**] | Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows: |
| [ ] | By hand delivery addressed as follows: | [ ] | By facsimile as follows: |
| [ ] | By messenger as follows: | [ ] | By federal express as follows: |

**ROBERT CORBIN, ESQ.**
801 West 5th Street
Los Angeles, California 90071

This Certificate is executed on **January 24, 2007** at Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

**Shaton McDaniel**